UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

KALVIN CANDLER,

        Defendant.
_____/

No. 17-20087

District Judge Victoria A. Roberts
Magistrate Judge R. Steven Whalen

## REPORT AND RECOMMENDATION

Defendant Kalvin Candler is charge in a one-count indictment with being a felon in possession of a firearm, 18 U.S.C. § 922(g)(1). Before the Court is his Motion to Suppress Statements That Were Involuntarily Elicited in Violation of Miranda and the Fifth Amendment [Doc. #18], which has been referred for a Report and Recommendation under 28 U.S.C. § 636(b)(1)(B). For the reasons that follow, I recommend that the motion be DENIED.

### I. FACTS

At the evidentiary hearing on Mr. Candler's motion to suppress, Investigator Lee Dyer of the Detroit Police Department testified that he was the Officer assigned to Mr. Candler's case. He first met Mr. Candler on January 20, 2017, at the Control Desk of Building 500 at the Detroit Detention Center. He and his partner, Investigator Linda Lawton, escorted Mr. Candler from the Control Desk to Building 100, between 200 and

400 yards away. (Tr. 8).¹ Officer Dyer testified that Mr. Candler was alert and responsive, that he made no complaints about not feeling well, and that he did not ask for medication or medical help. (Tr. 9). On the walk to Building 100, they ran into Mr. Candler's cousin, who was an employee at the Detention Center, and who told Mr. Candler to "just be truthful with these guys." (Tr. 10). During this walk, Officer Dyer asked Mr. Candler if he knew what he had been arrested for. Mr. Candler replied "[t]hat he had a gun." Mr. Candler had not been advised of his constitutional rights at that time. (Tr. 29).

Although Mr. Candler was handcuffed on the way to the interrogation room, he was not restrained in any way once he was in the room. (Tr. 11). The proceedings in the interview room were video recorded.²

Officer Dyer testified that when he started the interview in the interrogation room, he provided Mr. Candler with a printed form containing the *Miranda* rights.³ He had Mr. Candler read each of the rights out loud, and then initial next to each right. He said that at no point did Mr. Candler indicate that he did not understand his rights. He never invoked his right to remain silent or to have an attorney. (Tr. 14-18). When asked if he had any questions about his constitutional rights, Mr. Candler responded "that he was a convicted

---

¹ "Tr." refers to the transcript of the June 5, 2017 evidentiary hearing.

² The recording was admitted into evidence and played at the evidentiary hearing.

³ *Miranda v. Arizona*, 384 U.S. 436 (1966).

felon, and that he was off papers now, that he was off his parole or probation." (Tr. 19). About five minutes later, Officer Dyer re-advised Mr. Candler of his rights. While he was filling out paperwork, Mr. Candler was talking to Officer Lawton about his glaucoma, and how that could result in an epileptic seizure. He did not express any concern about his seizure medication, although on the tape he is heard saying that he had not received his medication. (Tr. 20-21, 32). He also said that the Detention Center was checking on the medication (Tr. 33). Officer Dyer testified that in a situation where he believes someone is in immediate need of medication, he stops the interview. However, he did not feel that was warranted in this case. (Tr. 21).

After Mr. Candler was advised of his rights, and had signed the rights form, Officer Dyer proceeded to the interrogation itself. He asked Mr. Candler if the gun that was found in the car the previous night belonged to him. Mr. Candler said that it belonged to his grandfather, and that he put the gun in his car for protection. (Tr. 22). Officer Dyer wrote the questions and answers on a form which Mr. Candler signed after being given the chance to correct any mistakes. (Tr. 22-23). The interview itself (excluding the advice of rights, the filling out of basic forms, and other conversation) lasted about 15 minutes, from about 10:40 a.m. to 10:55 a.m. At no time after the interview, or when they were walking back to Building 500, did Mr. Candler discuss his medication. (Tr. 24). At no time during or after the interview did Mr. Candler demand medication, ask for a break, or appear to have difficulty answering questions. (Tr. 25).

Mr. Candler also testified at the hearing. He stated that he had been diagnosed with epilepsy in 2010 or 2011. (Tr. 35). He was currently prescribed Keppra, 1000 mg, three time per day. (Tr. 36-37). When he was arrested on January 19, 2017, he informed the authorities at the Detention Center that he had epilepsy, and that was noted on the Detention Input Sheet, Government Exhibit 3. (Tr. 37-38). He had not taken his nighttime dose of Keppra at that time, nor was he provided with the medication the next morning. He testified that he asked the guards four times to see a medical provider. (Tr. 41). At some point after he was admitted he talked to a nurse, and told her that his pharmacy could deliver the medication to the Detention Center. He thought that she was going to try to get the medication. (Tr. 51).

On the way to the Control Center to meet the investigators on the morning of January 20, Mr. Candler asked the guard at the desk for a doctor, and was told to "talk to the investigators." In fact, he did not get his medication until the next day, January 21, after he had a seizure. The seizure occurred after his arraignment or bond hearing. (Tr. 45-46).

Mr. Candler testified that during the interview, Officers Dyer informed him of his *Miranda* rights, and asked if he had any questions. Officer Dyer asked if he had been threatened, and Mr. Candler replied that he had not. Mr. Candler himself during the interview that he had been "Mirandized." He testified that he understood his rights. (Tr. 56-57). Mr. Candler testified, "I didn't feel threatened. I just felt like after this I would

be able to get some medical attention." (Tr. 56). During the discussion with Officer Lawton about glaucoma and epilepsy, she asked him if he was getting his medication, to which he replied that "the DOC was checking on it." (Tr. 60). He testified that during the interview, he was not dazed or confused, but merely "compliant," because he thought he would get to see a nurse afterward. He did not fell like it was a voluntary choice for him to comply. (Tr. 65).

Jane Ramel, a nurse at the Detention Center, testified that she saw and evaluated Mr. Candler at approximately 5:00 a.m. on January 20, 2017. Mr. Candler told her that he was taking Keppra for epilepsy. After she completed her examination, she sent a fax to his pharmacy to verify his prescription. (Tr. 66-75). The procedure for obtaining medication involved faxing a request to the inmate's pharmacy for verification, receiving a return fax from the pharmacy indicating what medications have been prescribed, having a doctor at the detention facility write a prescription, and then filling the prescription at the facility. (Tr. 77-79).

## II. STANDARD OF REVIEW

"A defendant's statement made in response to custodial police interrogation must be suppressed unless the suspect first waived his *Miranda* rights 'voluntarily, knowingly and intelligently." *United States v. Ray*, 803 F.3d 244, 266 (6th Cir. 2015), quoting *United States v. Al-Cholan*, 610 F.3d 945, 954 (6th Cir. 2010). The prosecution bears the burden of proving, by at least a preponderance of the evidence, both the *Miranda* waiver and the

voluntariness of the confession. *Brown v. Illinois*, 422 U.S. 590, 604 (1975); *Colorado v. Connelly*, 479 U.S. 157, 169 (1986); *Lego v. Twomey*, 404 U.S. 477, 489 (1972).

## III. DISCUSSION

The admissibility of Mr. Candler's post-*Miranda* statement will depend on the answers to three sequential questions: (1) was his first, non-Mirandized statement to Officer Dyer as they were walking to the interrogation room the product of custodial interrogation; (2) if so, were the subsequent *Miranda* warnings "effective," in light of the previous non-Mirandized questioning; and (3) if so, was Mr. Candler's confession voluntary?

### A. The First Statement

As Officer Dyer was walking Mr. Candler from the control center to the interrogation room, he asked, "Do you know what you have been arrested for?" Mr. Candler replied that he had a gun. Mr. Candler had not been given *Miranda* warnings at that time. In *Rhode Island v. Innis*, 446 U.S. 291, 300-301 (1980), the Supreme Court held "that the *Miranda* safeguards come into play whenever a person in custody is subject to either express questioning or its functional equivalent....A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation."[4]

---

[4] There is no question that Mr. Candler was in custody at the Detroit Detention Center.

Officer Dyer testified that he asked this question because he "[j]ust wanted to make sure that he knew why he was there." (Tr. 29). The government argues that the question had no "investigatory purpose," and that "at its core, it is a yes or no question." *Government's Brief*, p. 14, Pg. ID 189. But it is unrealistic to posit that an ordinary person would give a one-word answer; in reality, the question "do you know why you've been arrested" is the functional equivalent of "why have you been arrested," and an experienced police officer like Officer Dyer would realize that a person like Mr. Candler, who knew that he had been arrested with a gun, would be reasonably likely to give an incriminating answer. This is the essence of an *Innis* violation. Moreover, if Officer Dyer wanted to make sure that Mr. Candler "knew why he was there," he could have simply told him that he had been arrested for unlawful possession of a firearm.

Mr. Candler's initial statement to Officer Dyer was therefore the product of a custodial interrogation in the absence of *Miranda* warnings, and is itself inadmissible.[5]

## B. The Second Statement

Mr. Candler gave his second statement after he was advised of and waived his *Miranda* rights. The next question is whether the effect of the *Miranda* advice was blunted or nullified by the previous unlawful interrogation.

---

[5] The government states that it does not intend to offer this statement into evidence.

In *Missouri v. Seibert*, 542 U.S. 600 (2004), the Supreme Court addressed the situation where a non-Mirandized interrogation is followed by an interrogation where *Miranda* warnings are given. A plurality of four Justices opined that the "threshold question in [this] situation is whether it would be reasonable to find that the warnings could function 'effectively' as *Miranda* requires." *Id*. at 612. To determine "whether *Miranda* warnings delivered midstream could be effective enough to accomplish their objective," *id*. at 615, the Court set forth five factors for consideration: (1) the completeness and detail involved in the first interrogation; (2) the overlapping content of the pre- and post-*Miranda* statements; (3) the timing and setting of the interrogations; (4) the continuity of police personnel during the two interrogations; and (5) the degree to which the interrogator's questions treated the second round as continuous with the first. *Id*. In *United States v. Ray*, 803 F.3d 244, 272-273 (6th Cir. 2015) (*Ray I*), the Sixth Circuit, noting a split in authority as to whether the four-Justice plurality in *Siebert* or Justice Kennedy's concurrence was controlling, and finding that both the plurality and the dissent received only four votes, concluded "that *Siebert* did not announce a binding rule of law with respect to the admissibility standard for statements given subsequent to midstream *Miranda* warnings." *Id*. at 272. However, the Sixth Circuit went on to adopt the plurality in *Siebert* as the law of this Circuit. ("We resolve this open question today by adopting the multi-factor test announced by the *Siebert* plurality."). *Id*.

Applying the *Siebert/Ray* factors in this case, I find that Officer Dyer's pre-*Miranda* question to Mr. Candler did not diminish the effectiveness of the subsequent *Miranda* warnings, and does not constitute a basis to suppress Mr. Candler's post-*Miranda* statements.

As to the first factor, Officer Dyer's single question to Mr. Candler–do you know why you were arrested–was neither extensive, focused, nor detailed. This is in stark contrast to cases where the Sixth Circuit has found *Miranda* warnings ineffective, under *Siebert*, in second-round interrogations. For example, in *United States v. Ashmore*, 609 Fed.App'x 306 (6th Cir. 2015), another felon-in-possession case, the agent asked the un-Mirandized defendant if he had any firearms on his person or in his car, and if his fingerprints would be found on any weapons, "like there were on the two guns found a couple of weeks earlier." *Id*. at 311-312. In *United States v. Ray*, __Fed.App'x__, 2017 WL 2471245 (6th Cir. 2017)(*Ray II*, following remand), the officers asked the defendant, pre-*Miranda*, whether he had been to jail before (to which defendant replied he had been to federal prison) and who owned the guns the police found in the house (for which the defendant took the blame). The officers also remarked that there was enough evidence to send defendant *and* his long-time girlfriend to jail, and made "veiled threats" about the girlfriend's continued employment. *Id*. at *1. Finding that the first *Siebert* factor weighed in favor of suppression, the Sixth Circuit stated, "By asking Ray about his possession and ownership of the guns, as well as his prior stint in federal prison, the

officers 'asked pre-*Miranda* the [only] question[s] relevant to a felon-in-possession charge." *Id*. at *5 (quoting *Ashmore*). In *United States v. Pacheco-Lopez*, 531 F.3d 420 (6th Cir. 2008), a drug case, agents obtained a search warrant at a house where a controlled buy had previously occurred, and detained the defendant during the execution of the warrant. Through a Spanish interpreter, the agents asked the defendant where he lived, to which he responded that he lived in Mexico, not at the house that was being searched. The agents then asked when he arrived at the house and how he had gotten there, to which he responded that he had driven from Mexico the previous Sunday in a white Ford pickup truck. *Id*. at 422.

The single, open-ended question that Officer Dyer asked, while sufficient to constitute a de-facto interrogation under *Rhode Island v. Innis*, does not rise to the level of the specific, focused pre-*Miranda* questioning in *Ray II*, *Ashmore*, and *Pacheco-Lopez*, and does not weigh in favor of suppression.

The second factor (the overlapping content of the two statements) and the fifth factor (the degree to which the interrogator's questions treated the second round as continuous with the first) can be considered together. In *Ray II*, the Court noted that pre-*Miranda*, the defendant admitted to owning the guns and to having served time in a federal prison, essentially conceding the elements of the felon-in-possession charge. Finding overlapping content of the defendant's two statements, the Court stated, "During the station-house questioning, the officers followed up on those responses based on 'the

knowledge [they] gleaned during the initial questioning.'" *Id*. at *5 (quoting *Pacheco-Lopez*, 531 F.3d at 428. As to the fifth factor, *Ray II* found that after the defendant had been advised on his *Miranda* rights, the officers "asked him ten questions–several of which were derivative of his earlier admissions...." *Id*. at *8. The Court explained:

> "For example, the officers did not ask Ray if he knew about the guns being in the house or if he possessed a gun. Instead, they asked, '[w]hich guns found in the house belong to you,' presumably because they knew Ray already admitted to owning at least one of the guns. Ray clarified that he owned only the shotgun found in the upstairs bedroom.
>
> "Likewise, the officers did not ask Ray general questions regarding past run-ins with the law or whether he had a prior record. Instead, they asked him more specifically if he was 'aware that [he] was a convicted felon'–presumably because Ray already admitted to doing time in a federal prison while being questioned at the house. The officers also asked a targeted question concerning whether Ray was 'aware that owning a firearm is against the terms of [his] release,' again, presumably as a follow-up to Ray's earlier admission about doing time." *Id*. (Internal citations to record omitted).

In *Pacheco-Lopez*, as *Ray II* noted, the Court found the second factor satisfied where the officers followed up on previous questions and answers. The Court also found that the two interrogations were continuous, "and that [the defendant's] statements were thus the result of a single, unwarned sequence of questioning." 531 F.3d at 428.

In *Ashmore*, the Court found that the second and fifth *Siebert* factors were met where "the pre-and post-*Miranda* questioning was materially the same," and where the agent "picked his line of questioning up post-*Miranda* right where he left off pre-*Miranda*...." 609 Fed.App'x at 317.

-11-

In the present case, even though Mr. Candler's first and second statements in a general sense both relate to the gun, there is no logical continuity between the two. Officer Dyer did not use or follow up on information gleaned from Mr. Candler's brief statement that he "had a gun." There was no "targeted questioning" in the post-*Miranda* interview that could reasonably be said to have been derived from Mr. Candler's pre-*Miranda* statement.

Which brings us to the third *Siebert* factor–the timing and sequence of the interrogations. A very short time span between a pre- and post-*Miranda* statement will bear scrutiny. In *Pacheco-Lopez*, for example, "[t]he interrogation was continuous–the break only lasted for the amount of time it took the investigators to read Lopez the *Miranda* warning." 531 F.3d at 420. In the present case, Officer Dyer estimates that he met Mr. Candler at the Control Desk around 10:00 a.m. (Tr. 8). The non-Mirandized statement was made during the relatively short walk to the interrogation room. Once they arrived at that room, the recording began. Both Officer Dyer's testimony and the recording itself shows a fairly lengthy conversation not dealing with the offense, as well as a thorough review of the *Miranda* rights. The video, which tracks the time, shows that Mr. Candler signed the *Miranda* form at 10:24 a.m., and that actual interrogation about the offense began at 10:42 a.m. So, approximately 40 minutes elapsed between Mr. Candler's first statement about the gun during the walk to the interrogation room and the time the post-*Miranda* interview began. During that interval, the advice of rights was not

-12-

a *pro forma* affair, but rather was conducted relatively carefully and meticulously, with Mr. Candler reading aloud and initialing each right, followed by Officer Dyer asking him if he understood or had any questions about his rights. Even though the two officers in the interrogation room were the same officers that were present during the first statement, there was a sufficiently discrete change in time and place that it cannot be reasonably said that Mr. Candler "would have viewed the two series of questions as part of one sequence." *Pacheco-Lopez*, 531 F.3d at 427-428. Unlike the situation in *Siebert*, Mr. Candler would not have had "the impression that the further questioning was a mere continuation of the earlier questions and responses," or that he would have "regard[ed] the two as part of a continuum." *Siebert*, 542 U.S. at 616-617.

### C. Voluntariness of the Miranda Waiver and the Statement

Speaking to the issue of voluntariness, the Sixth Circuit in *United States v. Hunter*, 332 F. App'x 285, 288-289 (6th Cir. 2009) summarized:

> "For a defendant's confession to be involuntary and therefore procured in violation of the Fifth Amendment, 'coercive police activity' must have preceded the confession. *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). 'An admission is deemed to be coerced when the conduct of law enforcement officials is such as to overbear the accused's will to resist.' *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir.1994). 'This Court has established three requirements for a finding that a confession was involuntary due to police coercion: (i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement.' *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir.1999). This Court determines whether a defendant's statement to police was voluntary by examining 'the totality of the circumstances.' *United States v. Finch*, 998

F.2d 349, 356 (6th Cir.1993). Circumstances to consider include 'the age of the accused, his level of education and intelligence, his physical condition and emotional state at the time of the confession, his expressed fears of violent reprisals, actual physical punishment, the proximity of the coerciveness of the confession as given, and the inherent coerciveness of the confession as given.' [*United States v.*] *Wrice*, 954 F.2d [406] at 411 [(6th Cir. 1992)]. In determining whether a defendant's will could have been overborne, the court may also consider whether the defendant had prior experience in the criminal justice system. *Ledbetter*, 35 F.3d at 1070. The government must prove the voluntariness of the defendant's statement by preponderance of the evidence. *Mahan*, 190 F.3d at 422."

Here, Mr. Candler suggests that his confession was involuntary–that he was "compliant" with the Officers–because he thought that he would not get his medication otherwise. Yet he concedes, and the recording of the interrogation shows, that at no time did he ask the Officers for his medication, nor did the Officers threaten him or tell him that he would not get his medication unless he waived his *Miranda* rights. In fact, when Officer Lawton asked him if he was getting his medication, he replied that "the DOC was checking on it." He did not ask for the Officers to get him his medication. Before Officer Dwyer questioned Mr. Candler about the gun, he meticulously informed him of his *Miranda* rights, and Mr. Candler not only acknowledged orally and in writing that he understood and waived those rights, but told Officer Dwyer that he had previously been "Mirandized." He had previous experience with the criminal justice system. Whatever Mr. Candler's subjective concerns may have been (and he testified that he did not feel threatened), there is simply no showing of objectively coercive police activity, the *sine qua non* of involuntariness due to police coercion. And while it is true that Mr. Candler

in fact had missed two doses of his epilepsy medication by the time he was interrogated, he was alert and responsive, and engaged in cogent conversation with the Officers. He did not suffer an epileptic seizure until the following day, more than 24 hours after the January 20 interrogation.

Viewing the totality of the circumstances, Mr. Candler's waiver of *Miranda* rights and his subsequent confession were not the product of police coercion that overcame his free will, but were knowingly, voluntarily, and intelligently made.

## IV. CONCLUSION

I therefore recommend that Defendant Kalvin Candler's Motion to Suppress Statements [Doc. #18] be DENIED.

Any objections to this Report and Recommendation must be filed within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served

upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: August 30, 2017        s/R. Steven Whalen
                              R. STEVEN WHALEN
                              UNITED STATES MAGISTRATE JUDGE

## CERTIFICATE OF SERVICE

**I hereby certify on August 30, 2017 that I electronically filed the foregoing paper with the Clerk of the Court sending notification of such filing to all counsel registered electronically. I hereby certify that a copy of this paper was mailed to non-registered ECF participants August 30, 2017.**

                              **s/Carolyn M. Ciesla**
                              **Case Manager for the**
                              **Honorable R. Steven Whalen**